**BUEHLER AG and Buhler, Inc., Plaintiffs,**

v.

**OCRIM S.p.A. Ocrim America, Inc., and Farmers Elevator of Dawn Inc. d/b/a Panhandle Milling Co., Defendants.**

**Civ. No. 3:90–CV–0771–H.**

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 17, 1993.

shouldered by Ocrim S.p.A. and Ocrim America    and not Farmers.

Van Jackson Hooker, Jay Vogelson, David A. Klingler, Stutzman & Bromberg, Dallas, TX, Gerald H. Kiel, Julius Fisher, William J. Sapone, McAulay Fisher Nissen Goldberg & Kiel, New York City, for plaintiffs.

Charles Martin Hosch, John Morant Cone, Strasburger & Price, Dallas, TX, M. Lawrence Olivero, Therese A. Hendricks, Wolf Greenfield & Sacks, Boston, MA, for defendants Farmers Elevator of Dawn, Inc. dba Panhandle Milling Co., Ocrim, SpA and Ocrim America, Inc.

Maxel (Bud) Silverberg, pro se, mediator.

## MEMORANDUM OPINION AND ORDER

SANDERS, Chief Judge.

A nonjury trial was held in this patent case on July 6–13, 1993. From the evidence produced at trial, the Court reaches the following decisions. With regard to Plaintiffs' claim of infringement of United States Patent numbers 4,140,285 and 4,339,083, the Court finds for Defendants. The patents are infringed neither literally nor under the doctrine of equivalents.

With regard to Defendants' counterclaim of invalidity and unenforceability of the patents in suit, the Court finds for Plaintiffs. On Defendants' remaining counterclaims of antitrust, tortious interference with contract, and misrepresentation under the Lanham Act, the Court finds for Plaintiffs.

Any finding of fact below may be deemed a conclusion of law, and any conclusion may be deemed a finding.

## I. FINDINGS OF FACT

### A. INFRINGEMENT

1. Plaintiff Buehler AG, a Swiss corporation, is the owner by assignment of the two patents in suit. Buehler AG is engaged in the design, manufacture, and worldwide sale of flour milling equipment. Wanzenried Testimony ["Tst"]; Plaintiffs' Exhibit ["PX"] 11.

2. Plaintiff Buhler, Inc., is a wholly owned American subsidiary of Buehler AG and is incorporated under the laws of Minnesota. Buhler, Inc., sells roller mills and complete flour mills to customers in the United States, Canada, and the Caribbean. Buhler, Inc., also provides engineering services, maintenance, and spare parts to its customers. Wanzenried Tst; PX 11.

3. Defendant Ocrim S.p.A. is an Italian corporation that manufactures and sells roller mills and flour mills in worldwide competition with Buehler AG. Bonoldi Tst; Rizzi Tst.

4. Defendant Ocrim America, Inc., is a wholly owned American subsidiary of Ocrim S.p.A. and is incorporated under the laws of Kansas. Ocrim America sells roller mills and complete flour mills in the United States. Bonoldi Tst; Rizzi Tst.

5. Defendant Farmers Elevator of Dawn, Inc. ["Farmers"], is a Texas milling company that is a customer of Ocrim America. Dillehay Tst. Farmers has been indemnified by Defendants Ocrim for liability in this suit. Id.

6. Defendants Ocrim SpA and Ocrim America have sold and Defendant Farmers has bought and used, in the United States, LAM grain roller mills accused of infringing the patents in suit. Dillehay Tst; PX 9, 20, 21. Defendants Ocrim have sold a total of approximately thirty-seven LAM roller mills in the United States. PX 26, 56.

7. A roller mill is a machine in a flour mill that grinds raw wheat or other grains in the production of flour. The grain is fed into the "roll gap" between parallel rollers, and the

rollers grind the grain. The roll gap can be adjusted in increments of a fraction of a millimeter to obtain a uniform coarse or fine consistency of the product. See Winteler Tst; Hibbs Tst; PX 1, 2.

8. The patents in suit are United States Patent No. 4,140,285 ["the '285 patent"] and United States Patent No. 4,339,083 ["the '083 patent"]. Neither patent is considered by Plaintiffs to be a "key" or "pioneer" patent. See Turner Tst; DX 646.

9. The '285 patent was filed in the United States on July 14, 1977, as application serial number 815,559. The '285 patent issued on February 20, 1979. PX 1.

10. The '083 patent was filed on April 21, 1980, as a continuation of the '285 patent application. The '083 patent issued on July 13, 1982. PX 2; Oisher Tst.

11. The specifications for both patents in suit are identically worded. See PX 1, 2. Plaintiffs represent to the Court that the two patents are intended to cover the same invention and "can be treated in this lawsuit as a single patent." Plfs' Proposed Findings and Conclusions, at 9. In order to obtain claim allowance for the '083 patent in light of the '285 patent, Plaintiffs submitted a terminal disclaimer, deeming the expiration date of the '083 patent to be the same as the '285 patent. DX 600.

12. Ocrim has no patents on any feature of the LAM. Bonoldi Tst; Turner Tst.

13. Plaintiffs' MDDK and MDDL roller mills are each the embodiment of both patents in suit. Winteler Tst. The MDDL roller mill is identical to the MDDK, except that it has double the number of rollers, tie members, and so on. See Winteler Tst. Reference to the MDDK throughout this opinion applies to the MDDL as well.

14. Attachment A is an accurate diagram of the MDDK roller mill as embodiment of the '285 claim elements relevant to the disposition of this case. See DX 341. Attachment B is an accurate diagram of the MDDK roller mill as embodiment of the '083 claim elements relevant to the disposition of this case.

See DX 342. Attachment C is an accurate diagram of the LAM roller mill.[1] See DX 343.

15. The claims at issue in the '285 patent are Claims 1 and 2. For the '083 patent, Claims 1, 2, 7, 8, 10–12, and 17–19 are at issue. The sole independent claim for each patent is Claim 1. See Oisher Tst; Turner Tst.

16. Claim 1 of the patents in suit describes the MDDK's "roll package," which comprises the rollers, mechanisms for controlling the roll gap, and structural member on which the subassembly is mounted. See PX 314; Maechler Depo., at 39.

17. In the MDDK, the roll package forms a closed system of forces. That is, the forces and vibration generated by approximately four tons of pressure generated between the rollers in grinding grain are contained within the roll package; the forces and vibration are not transmitted from the structural member, on which the roll assembly is mounted, to the base or frame. Winteler Tst; PX 1, 2, 36B; Blanco Tst; Turner Tst; Oisher Tst.

18. Force containment within a roll subassembly has several advantages. First, the traditional massive metal frame, always necessary in the past to contain the grinding force and vibration and to stabilize the roller mill, is no longer necessary. Second, noise is reduced. Third, the amount of "throughput," or milled grain, can be increased. Fourth, the roll package can be manufactured, installed, and maintained independently from the frame. And fifth, the roll gap is stabilized, obviating the need for frequent manual adjustment of the roll gap by the miller. See Winteler Tst; PX 1, 2; Bonoldi Tst; Blanco Tst. This final advantage is critical to a flour mill's ability to achieve increased levels of automation. Bonoldi Tst; Blanco Tst.

19. A "closed" loop of forces that includes the base or frame in the loop is well-known in the art; it is the elimination of the base from the loop that is the achievement of the

1. Component parts of the MDDK and LAM are identified in this opinion by reference to Attachments A, B, and C.

MDDK. Hibbs Tst; *see* PX 1, col. 2, 3; PX 2, col. 2, 3.

20. The MDDK roll package is "independent." That is, it can be assembled, installed, maintained, and replaced independently of the base. Winteler Tst. In practice, Plaintiff does not remove the roller assembly as a unit for purposes of maintenance or replacement. Wanzenried Tst.

21. Claim 1 of the '285 patent reads as follows:

1. A roller mill comprising:

(a) a base;

(b) a pair of tie members;

(c) means mounting said tie members on said base in spaced parallel relationship;

(d) first and second grinding rolls;

(e) a pair of stationary bearings journaling opposite ends of said first roll, each of said stationary bearings being rigidly secured to a different one of said tie members;

(f) a pair of movable bearings journaling the opposite ends of said second roll and being pivotally mounted each on a different one of said tie members on an axis parallel to the axes of said rolls for free movements of said second roll toward and away from said first roll;

(g) a pair of levers each pivotally mounted on a different one of said stationary bearings;

(h) a pair of adjustment members each mounted on a different one of said tie members and each connected to a respective lever to impart movement thereto;

(i) a pair of connecting members each having portions engaging a respective one of said movable bearings and each having other portions engaging a respective one of said levers for limiting free movement of said movable bearings away from said stationary bearings;

(j) and yielding means on said connecting members operatively engaging their respective movable bearings to yieldingly hold said movable bearings against movement way from their respective bearings beyond the limit of free movement thereof, said adjustment members being operative to vary the limit of said free movement of said movable bearings in a direction away from said stationary bearings.

PX 1, col. 18–19.

22. The elements of Claim 1 of the '083 patent follow:

1. A roller mill for the milling of cereal or the like comprising:

(a) a main base frame arranged to be mounted on the floor of a mill house;

(b) first and second mill rolls;

(c) a pair of fixed bearing housings supported on said main base frame to carry said first mill roll;

(d) a pair of movable bearing housings supported on said main base frame to carry said second mill roll and adjustable loading means operatively between said fixed bearing housings and said movable bearing housings to contain the separating forces acting on said mill rolls in operation of the mill; independently from said main frame;

(e) said adjustable loading means having a tie member;

(f) first roll gap adjusting means arranged between said fixed and movable bearing housings and second roll gap adjusting means operatively interposed between said first roll gap adjusting means and said tie member;

(g) said fixed and movable bearing housings being respectively mounted on said tie member independently of said main base frame and said tie member being supported on said main base frame, said first roll gap adjusting means including a loading member arranged between said fixed and movable bearing housings and said second roll gap adjusting means including a lever means pivotally mounted on one of said bearing housings and associated with said first gap adjusting means so that the pivoting of said lever means adjusts the roll gap and a screw adjustment device operatively arranged between said lever means and said tie member.

PX 2, col. 18–19 (letter identification added to elements for convenience of referral); DX 344B (same).

23. The LAM component that most closely corresponds to the "base" in element 1(a) of the '285 patent and the "main base frame" in element 1(a)[2] of the '083 patent, both embodied in MDDK part 29, is the LAM "cast iron frame," component part 5. The LAM frame is a massive supporting cast-iron structure designed to receive and to dissipate grinding forces and vibrations and to stabilize the roller mill. Bonoldi Tst; Blanco Tst; see DX 318. It weighs almost two tons. It is and must be of a material and strength to prevent stretching or distortion caused by absorption of the grinding forces from the roll assembly. See Blanco Tst. The LAM frame is permanently attached to the LAM roller assembly itself. Blanco Tst; Bonoldi Tst. In contrast, the MDDK base or main base frame, as the patent elements are construed below, serves only to support the roll package off the floor. It is independent of the roll package and need not be massive or of a material able to absorb grinding forces without stretching or distortion. See Conclusion of Law ["CL"] 9; Maechler Depo., at 121; Turner Tst; Blanco Tst. The LAM frame does not, therefore, perform the same function as the MDDK base.

24. The LAM component that most closely corresponds to the "tie member" in element 1(b) of the '285 patent and elements 1(e), (f), and (g) of the '083 patent, both embodied in MDDK part 27, is the LAM "C-plate," component part 6. The C-plate was made of steel in the first version of the LAM; it is now made of cast-iron. Bonoldi Tst; Oisher Tst. The C-plate is rigidly attached to the frame by pressure-fit pins and ten bolts in compressed metal-to-metal contact. Bonoldi Tst; Blanco Tst. In contrast, the MDDK tie member is attached to the base in such a way that a space is left between the tie member and the base. Maechler Depo., at 232–33; Turner Tst. Unlike the LAM C-plate, the MDDK tie member is designed to be removed from the base should the need arise. Turner Tst.

25. The function of the C-plate is to add thickness and strength to the cast-iron frame. Bonoldi Tst. The cast-iron frame cannot, without cracking, be manufactured in one piece thick enough to tolerate the forces and vibration associated with increased speed and throughput. Bonoldi Tst. Reinforcing a cast-iron frame with a metal plate is known in the art. See Bonoldi Tst. The C-plate does not perform the same function as the MDDK tie member; nor does it achieve the same result. Turner Tst.

26. The LAM component most closely corresponding to the "means mounting" the tie members to the base in element 1(c) of the '285 patent, embodied in MDDK part 50, is the "pin," component part 9, and the "bolt to frame," component part 7. These parts conduct grinding forces and vibrations from the C-plate to the frame. Cole Tst; Blanco Tst. They permanently attach the C-plate to the frame, with metal-to-metal contact. Bonoldi Tst; Blanco Tst. The MDDK's "means mounting," on the other hand as construed below, spaces the tie member from the base to prevent such transference of forces and vibrations. See CL 12–13. The LAM bolts and pins do not function in the same way as the MDDK "means mounting" or with the same result. See Turner Tst.

27. Unlike the LAM bolts, the bolt attaching the MDDK tie member to the base are completely surrounded by a damping material and do not directly contact the tie member. Maechler Depo, at 228.

28. The "means mounting" language in element 1(c) of the '285 patent did not appear in the original version of the patent application. It was added to an amended version of Claim 1 during prosecution. See DX 599. Addition of the language was necessary to obtain claim allowance. See Turner Tst.

29. The grinding rolls described in element 1(d) of the '285 patent and element 1(b) of the '083 patent are substantially identical with the grinding rolls on the LAM machine and on prior art. Winteler Tst; Bonoldi Tst.

30. The LAM component that most closely corresponds to the "stationary bearing" in

---

2. Although the claim elements of the '083 patent are not so labeled, they are referred to by letter for convenience, as established in Finding of Fact 22.

element 1(e) of the '285 patent and the "fixed bearing housing" in element 1(c) of the '083 patent, both embodied in MDDK part 26, is the LAM "stationary bearing housing," component part 8. The MDDK stationary bearing is stronger and able to withstand higher loads than the LAM stationary bearing. Bonoldi Tst.

31. The LAM component that most closely corresponds to the "movable bearing" in element 1(f) of the '285 patent and the "movable bearing housing" in element 1(d) of the '083 patent, both embodied in MDDK part 23, is the LAM "movable bearing housing," component part 11. Although the MDDK is dissimilar in that the movable bearing housing is "beefed up" on one side to tolerate more grinding load, the components are similar for the two machines. See DX 341, 342, 343; Winteler Tst; see also PX 316.

32. The LAM component that most closely corresponds to the "lever means" in element 1(g) of the '285 patent and element 1(g) of the '083 patent, both embodied in MDDK part 38, is the LAM "lever," component part 3. The MDDK lever means is mounted on the stationary or fixed housing, part 26. The LAM lever is not mounted on the LAM stationary bearing housing, part 8. Instead, the LAM lever is mounted with a lever eccentric on the C-plate, part 6. Blanco Tst; Bonoldi Tst; Turner Tst.

33. One of the high areas of stress on the MDDK, besides on the tie member and the beefed-up portion of the movable bearing housing, is on the mounting of the lever means, part 38. PX 316. Similarly, as measured by Defendants' strain gauge analysis, the LAM lever receives a substantial amount of the grinding force and vibrations. See Cole Tst; Blanco Tst; DX 354.

34. The language of element 1(g) of the '285 patent did not appear on the original patent application. It was added to an amended version of Claim 1 during prosecution. See DX 599. The language was necessary to obtain claim allowance. Turner Tst.

35. The LAM component that most closely corresponds to the "adjustment member" in element 1(h) of the '285 patent and the "screw adjustment device" in element 1(g) of the '083 patent, both embodied in MDDK part 42, is the LAM "adjustment screw," component part 2. This adjustment device on both machines is sometimes called the fine-adjustment means; it is a part of the second roll gap adjustment means. Turner Tst; Bonoldi Tst. For both roller mills, this adjustment device is connected to and gives movement to the lever or lever means. Bonoldi Tst; see DX 341, 342, 343. For both machines, this adjustment device is and must be accessible from outside the roller mill. Bonoldi Tst. In the MDDK, the adjustment device 42 is attached to an extension of the tie member and is located between the stationary bearing housing, with its attached lever, and the tie member. PX 1, 2; DX 341, 342. In the LAM machine, on the other hand, the adjustment device 2 is connected directly to the cast-iron frame. Bonoldi Tst; Blanco Tst; see DX 343. The LAM adjustment device does not function in the same way or with the same result as the MDDK screw adjustment device. Turner Tst.

36. In both patent claims, the tie member and base are recited as distinct mechanical structures. PX 1 & 2, col. 18.

37. The claim language of 1(h) of the '285 patent was incorporated into an amended version of the patent application following rejection of the original application. See DX 599.

38. The LAM "rod," part 13, and "gross gap adjustment turnbuckle," part 14, do not correspond to the "adjustment member" or "screw adjustment device" described above. Those LAM components do not function to move the lever or lever means; instead, the lever functions to move those LAM components. Bonoldi Tst; Turner Tst. Their location in the LAM roller mill is between the lever and the overload spring, part 12. See DX 343. Unlike the MDDK screw adjustment device, these components are neither externally accessible to the miller for fine adjustment of the roll gap, nor arranged between the stationary and movable bearing housings. Bonoldi Tst; see DX 343; PX 1 & 2, col. 18–19.

39. The LAM component that most closely corresponds to the "connecting member" in element 1(i) of the '285 patent and the

"first roll gap adjusting means" in elements 1(f) and (g) of the '083 patent, both embodied in MDDK parts 32 and 35–37, is the LAM "rod" and "gross gap adjustment turnbuckle," component parts 13 and 14. Unlike the MDDK's connecting member, the LAM components are not located between the movable and stationary bearing housings, but rather are located above the bearing housings. DX 566, at D023800; *see* DX 341, 342, 343.

40. The LAM component that most closely corresponds to the "yielding means" in element 1(j) of the '285 patent, embodied in MDDK part 51, is the LAM "overload spring," component part 12.

41. The prior art relevant to the patents in suit is very crowded, as evidenced by the long history of roller mills and the long prosecution histories of the patents in suit. *See* Winteler Tst; DX 599, 600; Finding of Fact ["FF"] 42, 43, 44, 61, 62. The basic process of grinding grain with a roller mill has been practiced for at least a century. Winteler Tst.

42. The original application for the '285 patent was rejected for two reasons: (1) because it contained numerous errors; and (2) because it did not warrant allowance in view of prior art. *See* DX 599.

43. The amendment to the '285 patent application, dated July 14, 1977, was necessary to obtain claim allowance. Turner Tst. The amendment defines and limits the scope of Claim 1 with the following language (numerical references are to Attachment A, MDDK component parts):

> [Claim 1] is believed to distinguish over the cited art in its definition of adjustment mechanism [which] comprises a pair of levers [38] each pivotally mounted on a different one of the stationary bearings [26] ..., adjustment members [42] each mounted on a different tie member [27] and each connected to one of the operative portions of a respective one of the levers [38], and connecting members [32] each engaging a different one of the other of said operative lever portions and said yielding means [51]. *Clearly, none of the references ... show this precise structure,* particularly in an arrangement where the several bearings are mounted on tie mem-

bers at the opposite ends of the rolls, together with means mounting [50] the tie members [27] on a base [29] as claimed. Applicants' structure as defined in [Claim 1] has a distinct advantage in being easily removed from a supporting base for replacement or repair of any of the parts thereof, and of easy and precise adjustment of the roll system when installed in the mill system.

DX 599 (emphasis added).

44. The amendment to the '083 patent application, dated April 21, 1980, was necessary to obtain claim allowance. Turner Tst. The amendment defines and limits the scope of Claim 1 with the following language (numerical references are to Exhibit B, MDDK component parts):

> [T]he specifically claimed adjustable loading means [32, 35–37, 38, 42] provides the necessary structure *in order to contain the separating forces acting on the mill rolls independently from the main frame* so that the device can be constructed without consideration of the main frame [29] to which it is to be attached. *This provides an important improvement over the prior art* in that the roller mill structure can be separately built to exacting specifications with the knowledge that it can be attached to a main frame structure in a factory location and still operate according to the preciseness built into the machine before it was attached to its main frame to be used.

DX 600 (emphasis added).

45. Because of the close relationship between the patent applications, the prosecution history of each is relevant to the other. Turner Tst.

46. Of the figures in the patent specifications, Figure 4 most closely represents Claim 1 of each patent. *See* DX 600 ("The new [Claim 1] is constructed in such a manner to be indicative of the Figure 4 embodiment...."); Turner Tst. Figure 1 of the specifications of both patents does not represent Claim 1 of the respective patents. *See* PX 1, col. 11 ("All the other elements.... are omitted [from Figure 1] in order to leave the drawing easier to read. Reference

should be made to known constructions."); PX 2, col. 11 (same); Turner Tst.

47. Ocrim has increased the speed and throughput capacity with each new version of its roller mills LK, LKK, and LAM; throughput capacity tripled from first to last. Bonoldi Tst. At the time Ocrim decided to develop the LAM to succeed the LKK, Ocrim examined the MDDK and roller mills from other companies. Bonoldi Tst; *see* PX 143.

48. The LAM resembles the MDDK in that both employ horizontally oriented rollers. Winteler Tst. Horizontal rollers, which allow increased throughput capability, are known in the art and have been used for fifty years in the United States. Bonoldi Tst; DX 347, 367B1. Horizontal rollers allow increased throughput capability. Bonoldi Tst. The horizontal orientation of the rollers is not an element of the patents in suit. *See* PX 1, 2; Oisher Tst.

49. The LAM resembles the MDDK in the parallel orientation of the engagement-disengagement device. That device and orientation are not elements of Claim 1 of the patents in suit. *See* PX 1, 2; Oisher Tst; *see also* DX 367B2.

50. The LAM roller mill does not comprise a closed loop of forces. Grinding forces and vibrations are transmitted to the C-plate from the grinding mechanism, and from the C-plate to the cast-iron frame. Cole Tst; Blanco Tst; Turner Tst; Bonoldi Tst; *see* DX 354. Primary points on the LAM for transmission of the force and vibration to the frame are the lever eccentric, which is attached to the C-plate, the screw adjustment device, which is attached to the frame, and the bolts that attach the C-plate to the frame. Cole Tst; Blanco Tst.

51. Plaintiffs' "force analysis" of the LAM is based on faulty assumptions; its result is therefore unreliable. Blanco Tst; DX 365; PX 227.

52. Defendants' basic "strain gauge" analysis was appropriately conducted by an independent tester. See Cole Tst; Blanco Tst; Dillehay Tst. The test's purpose was to determine whether significant forces were transmitted from the LAM C-plate to the frame. Cole Tst. The test was not suffi-

ciently comprehensive to determine the percentage of forces transferred to the frame. Cole Tst; Blanco Tst.

53. Comprehensive strain-gauge analysis could have provided quantification of any grinding forces confined to the LAM C-plate. Cole Tst; Blanco Tst. Plaintiff had the opportunity to conduct such or similar testing. Dillehay Tst.

54. Ocrim's sales brochures and manuals do not support infringement, in part because of the unproven accuracy of translation of key phrases from Italian to English. *See* DX 58, 60; *see also* Bonoldi Tst.

55. The LAM roller mill has no independent subassembly. The C-plate is permanently attached to the frame by bolts and pins; 50 tons of force would be required to separate the C-plate from the frame. Blanco Tst; Bonoldi Tst. Other components are attached either to the C-plate or to the frame. DX 343. Removal of the LAM roll assembly from the frame is accomplished only piece by piece. Bonoldi Tst.

### B. EXCEPTIONAL CASE

56. Plaintiffs practiced inequitable conduct before the Examiner in prosecuting United States Patent No. 4,442,980 ["the '980 patent"], which was held to be invalid in an earlier order in this case. *Buehler AG v. Ocrim SpA,* 836 F.Supp. 1291, (N.D.Tex. 1992) (awarding summary judgment to Defendants).

57. Plaintiffs' testimony at trial exceeded the limits of credulity on more than one occasion. A particular example was the eleventh-hour ability of mechanical engineering expert Dittrich, when re-called in rebuttal at trial in this three-year-old litigation, to quantify for the first time the percentage ("75–80%") of forces retained in the LAM C-plate.

58. The issue of quantification of the transference of grinding forces from the LAM C-plate to the cast-iron frame is and always has been central to Plaintiff's case in chief. Although conclusive testing means is available, *see* FF 53, Plaintiffs were able to offer no objective, probative evidence on the issue in this otherwise sophisticated and expensive litigation. *See* FF 51.

59. Under all the circumstances of this case, the Court infers that Plaintiffs have known throughout the litigation that most or all of the grinding force and vibrations in the LAM machine are transmitted from the C-plate to the frame. *Cf.* DX 30, 566, 567, 575.

60. Plaintiffs' claim of literal infringement is frivolous. *See* CL 5, 11, 14, 16, 18, 20–22.

## C. INVALIDITY AND UNENFORCE-ABILITY

61. The prior art considered by the Examiner during prosecution of the '285 patent includes the roller mills known as Wiemer, Rendel, Fielden, Linden, Beyeler, Verdier, Lloyd, Alciati, and Peterson. DX 599. Of these, the Linden and Fielden are the most relevant. *See* PX 354; Oisher Tst.

62. The most relevant prior art not considered by the Examiner includes the roller mills known as Ganz, Turner, Davis, Golfetto GLB, Buehler MDDC, and Ocrim LKK. *See* DX 346, 347, 348, 629, 636, 344C.

63. The relevant scope and content of prior art can be described as European roller mills in existence at the time of prosecution, both considered by the patent examiner and not considered, as listed above.

64. Of the relevant prior art, no device includes all of the claimed features or advantages of the patents in suit. Winteler Tst; Hibbs Tst. Unlike the MDDK, all machines except the Ganz and Linden mount bearing housings directly onto the frame; none mount the bearing housings on a tie member. *See* PX 354. Of those with a separate second or "fine" roll gap adjustment means with a separate screw device, all mount the device on the frame itself. *See id.*

65. Of the undisclosed devices, only the Ganz, United States Patent number 1,579,-998, would have been helpful to a reasonable examiner in determining claim allowance for the patents in suit. *See* PX 354; Turner Tst; *see also* Oisher Tst.

66. The Ganz roller mill was patented in 1924. It is similar to the MDDK in that it mounts a roll package on a tie member "arm". *See* DX 300, 436. The arm is spaced from the frame and parallel to it. *See* DX 436; Bonoldi Tst. The Ganz machine is dis-similar in that it uses regular bolts, without damping means, to attach the arm to the frame. *Id.* The Ganz uses a massive cast-iron frame, though an object of the invention was to reduce the size of the frame somewhat. *Id.* A crucial difference between the Ganz and the MDDK is that its adjustment screw member, as part of the second roll-gap adjustment means, is attached directly to the frame and not to the arm. *See* DX 300; Bonoldi Tst. The Ganz roll package cannot be maintained and replaced independently from the frame. *See* DX 300, 436. Although the Ganz patent attempts to relieve from the base the pressures of the grinding process, *see* DX 436, at 1, lns 85–89, the degree of success the machine attained is unknown. Turner Tst. A purpose of the invention was to "ensure an exact and sensitive parallel adjustment of the rollers." DX 436. The patent teaches a method of making rollers parallel by tilting supports for the bearings at opposite ends; parallel construction was not otherwise possible in those days. Oisher Tst.

67. The GANZ patent is important primarily in illustrating the necessity of interpreting Plaintiffs' patent claims narrowly because of the prior art. Turner Tst.

68. The MDDK and the LAM operate at approximately the same speed of 800 rpm. Previously designed roller mills operate at a top speed of approximately 500 rpm. Wanzenried Tst.

69. In the prior art, throughput capacity was limited because of the lower speed of the rollers. Even so, pivot points on the cast-iron frames would wear and throw the machine out of adjustment. Hibbs Tst.

70. The MDDK achieves a substantial increase in throughput capacity over the prior art. Winteler Tst. A portion of that increased capability is due to a patented suction air removal system that the LAM machine is not accused of infringing. Winteler Tst; Caderas Tst.

71. The MDDK achieves a reduction in overall noise level, from 92 to 85 decibels. The damping layer made of rubber accounts for about one-half the reduction. Winteler Tst.

72. The level of ordinary skill in the art of roller mill design is represented by a hypothetical person having a degree in mechanical engineering or the equivalent in grain mill design, or having basic knowledge of mechanical engineering plus hands-on experience in the industry. Oisher Tst; *see* Blanco Tst. Ocrim's designers are representative of the ordinary level of skill in the industry. Oisher Tst; see Bonoldi Tst. and Narrative Stmt. Plaintiffs' designers generally exceed the level of ordinary skill. *See* Wanzenried Narrative Stmt; Winteler Narrative Stmt; Maechler Depo.

73. To improve the throughput capability of Ocrim's predecessor LAM machine, a person of ordinary skill would attempt to strengthen the frame and housings. Blanco Tst.

74. The MDDK was developed only after more than ten years of research and an investment of more than $7 million. Winteler Tst; Caderas Tst.

75. There has been a long-felt need in the milling industry for a roller mill that could, at a reasonable cost, produce higher throughput with less noise, allow increased automation, increase sanitation and safety, and reduce maintenance time and costs. PX 28; Winteler Tst. The MDDK meets these long-felt needs. *See* Winteler Tst; Oisher Tst; Wanzenried Tst.

76. The MDDK is commercially successful. Wanzenried Tst; PX 92, 325, 352, Plaintiffs have sold approximately 8500 MDDK (and MDDL) roller mills worldwide since their introduction in late 1970s. Caderas Tst; PX 45, 325 357. Because of the MDDK's success, Plaintiffs no longer sell the prior models, except as replacements for existing customer mills. Wanzenried Tst.

D. *ANTITRUST*

77. The three types of roller mills sold in the United States are (1) new, automatic roller millers with European technology ["European mills"]; (2) used, rebuilt European mills; and (3) American-made roller mills ["American mills"]. Clegg Tst.

78. The European mills have significantly higher throughput capacity and lend them-

selves to automation better than American mills. European manufacturers characterize the American mills as "Model Ts." Wanzenried Tst; Maechler Depo. The American roller mills are approximately one-half the cost of European mills and require more labor for operation. Clegg Tst; Wanzenried Tst; *see* PX 98, at 16.

79. American roller mills compete directly and successfully with European roller mills in the United States market. PX 98, at 16; Douglas Tst; Hibbs Tst. Creason Corrugating and Machinery Company, a manufacturer of American roller mills, recently sold sixty roller mills to ADM Milling, a division of the international Archer Daniels Midland Company. Hibbs Tst. Kice, an American roller mill manufacturer, has recently sold twelve roller mills in the United States. Hibbs Tst; PX 361.

80. The American market for roller mills is competitive. PX 98, 136; Clegg Tst; Thompson Depo.; Douglas Tst. Profit margins are small. *Id.* An American milling company is free to invite bids from the milling equipment vendors of its choice. Rizzi Tst; Hibbs Tst; Douglas Tst.

81. In the approximately $45 million United States market for European and American roller mills, Plaintiffs have a market share of about 6%. *See* PX 136; DX 367, at 11; Clegg Tst.

82. For United States sales of European roller mills from 1980–1991, Plaintiffs have a 60% market share. Clegg Tst; DX 367. From 1980 until approximately 1985, Plaintiff was the sole seller of European roller mills in the United States. Douglas Tst. In this narrow market, market share can change significantly with one single purchase order, which can include one or many roller mills. Douglas Tst. Plaintiff's market share dropped this year by 2.9% because of one sale made by the Defendants Ocrim. With that same sale, Ocrim's market share went from 7.5% to 10.4%. Clegg Tst; DX 367.

83. Since 1980, five companies have marketed European mills in the United States: Plaintiffs, Defendants, Golfetto, Berga/Sangati, and Satake/Robinson. Clegg Tst; DX 367.

84. In 1992, Plaintiffs sold sixty-eight roller mills in the United States; Defendants sold fourteen. Rizzi Tst. In 1993, Defendants have made one sale in the United States. Plaintiffs have made no sales in the United States in 1993. PX 357.

85. Plaintiff Buhler, Inc., has a large, customer-oriented, presence in the Unites States for sales and service. Clegg Tst; Hibbs Tst; PX 54. Plaintiffs have service and maintenance capabilities in the United States superior to other non-American roller mill sales companies. Wanzenried Tst; Bonoldi Tst; PX 136.

86. Defendants Ocrim have about ten salespeople in the United States and no service engineers. Clegg Tst. Defendant Ocrim America has received fewer resources from its parent company than it has deemed necessary for successful United States operations. *See* PX 136.

*E. LANHAM ACT*

87. Plaintiffs advertise very little. They have issued no commercial advertising or promotion concerning the qualities, nature, or characteristics of the LAM roller mill or of the Ocrim companies. They have not discussed this lawsuit except as necessary. *See* Wanzenried Tst.

*F. TORTIOUS INTERFERENCE WITH CONTRACT*

88. Defendant Ocrim America executed a contract with Defendant Farmers for the sale of a complete flour mill. Dillehay Tst.

## II. CONCLUSIONS OF LAW

*A. INFRINGEMENT*

■ 1. One who makes, uses, or sells another's patented invention within the United States is liable for infringement. 35 U.S.C. §§ 154, 271(a). Plaintiff has the burden to show infringement by a preponderance of the evidence. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758 (Fed.Cir. 1984).

■ 2. Literal infringement requires a two-step analysis: (1) construing the patent's claims; and (2) determining whether a claim "reads on" the accused device. The first step is a question of law; the second is a question of fact. *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed. Cir.1985).

■ 3. To construe the words of a patent's claim elements, the Court looks primarily to the patent's specification, or description. *See Arachnid, Inc. v. Medalist Mktg Corp.,* 972 F.2d 1300, 1302 (Fed.Cir.1992); *Standard Oil,* 774 F.2d at 452. Claim construction is further limited by a patent's prosecution history "so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Id.* at 452. References to a preferred embodiment or to an advantage of the invention in a patent specification are not claim limitations unless the specification so requires. *See Intel Corp. v. United States Int'l Trade Comm'n,* 946 F.2d 821 (Fed.Cir.1991); *Laitram Corp. v. Cambridge Wire Cloth Co.,* 863 F.2d 855, 860–62 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1068, 109 S.Ct. 2069, 104 L.Ed.2d 634 (1989).

■ 4. For the second step of the inquiry into literal infringement, the Court must, in an element-by-element comparative analysis of the claims and the offending product, determine identity of structure, operation and result. *Atlas Powder Co. v. E.I. Du Pont de Nemours,* 750 F.2d 1569, 1579 (Fed.Cir. 1984).

■ 5. For infringement to exist, every limitation in a patent claim must be met exactly or by a substantial equivalent. *Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 796 (Fed.Cir.1990). The failure of an allegedly infringing device to meet even a single patent claim limitation negates infringement. *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991).

6. Because of the prosecution history in this case, Plaintiff's claims must be construed narrowly. *See Standard Oil,* 774 F.2d at 452; FF 28, 34, 37, 42–44.

■ 7. Claim 1 of both patents [3] is clearly intended to describe a roller mill that confines the grinding forces to the roller assembly without transmitting the forces or vibration to the base. *See* PX 1 ('285 patent), col. 3 ("The invention is characterised in that the pair of rolls . . . is supported on a base as a roll assembly forming a closed system of forces with the grinding gap adjusting device."); PX 2 ('083 patent), col. 3 (same); PX 1, col. 3 ("The core of the invention is the deliberate co-operation in a closed pattern of forces of the two grinding rolls with the adjusting devices, supported as a roll assembly on a base."); PX 2, col. 4 (same); PX 1, col. 6 ("The pressure forces resulting in the grinding gap are held in equilibrium on the one hand above by way of the adjusting device, or the corresponding unit, and below by means of a massive tie member connecting the two bearing housings."); PX 2, col. 6–7 (same); PX 1, col. 7 ("The line of force as regards the grinding forces . . . can be closed directly by way of the tie member on the one hand and the adjusting device or the unit on the other hand."); PX 2, col. 7 (same); PX 2, col. 18 ("What is claimed is . . . to contain the separating forces acting on said mill rolls in operation of the mill; independently from said main frame. . . ."); *see also* PX 1, col. 3 ("The invention has as its object to develop a grinding and breaking apparatus which allows better and more simple control of the grinding operation and as far as possible obviates disturbing influences from the outside and towards the outside."); PX 2, col 3 (same); FF 16–19. Such a construction was necessary during prosecution to obtain claim allowance. *See* FF 42–44. The Court therefore construes each of the elements of Claim 1 of both patents within the context of its role in the closed loop of forces.

■ 8. Claim 1 of both patents is clearly intended to specify a roll package designed to be mounted independently from the base. That is, the roll package is designed to be assembled separately from the base and removed as one unit for maintenance or replacement. *See* PX 1, col. 7 ("It has been found that by securing the bearings of a grinding roll in a non-pivotable manner, assembly is very greatly facilitated. It is possible to fit and dismount each roll individually and also the roll assembly in its entirety."); PX 2, col. 7 (same); PX 1, col 18 ("The pair of rolls constructed as a roll assembly according to the invention allows the manufacturer and also the client to mount and dismount the entire assembly as a single unit in the case of relatively large changes."); PX 2, col. 18 (same); PX 2, col. 19 ("What is claimed is . . . said fixed and movable bearing housings being respectively mounted on said tie member independently of said main base frame. . . ."). Such a construction was necessary during prosecution to obtain claim allowance. *See* FF 42–44. Plaintiffs' current practice of not removing the roll package as a unit for maintenance and replacement is irrelevant to this inquiry.

9. Element 1(a) of the '285 patent, the "base," and element 1(a) of the '083 patent, the "main base frame," are properly construed to describe a support for the roll package to keep it above the floor. The base need not be massive or of a material designed to resist distortion when exposed to grinding forces and vibrations. *See* PX 1, col. 4 ("The base can be given a very simple construction since it no longer has any influence on the forces in the grinding gap."); PX 2, col. 4 (same).

10. Element 1(b) of the '285 patent, the "tie members," and element 1(e) of the '083 patent, the "tie member," are properly construed to describe a structure on which the remainder of the roll package is mounted. The tie member is and must be a structure that closes the loop of forces without transmitting the grinding forces to the base. *See* CL 7. It must serve to isolate the roll package from the base. *See* CL 8.

■ 11. Element 1(b) of the '285 patent, the "tie members," and element 1(e) of the '083 patent, the "tie member," are not literally infringed by the LAM C-plate. The C-plate neither closes the loop of forces within the LAM machine nor serves to mount the

---

**3.** Because the patent specifications are identical, corresponding claim elements for both patents are construed simultaneously. *See* FF 11.

roll assembly in an independent package. *See* FF 24–25. It is instead an extension of the frame. *See id.*

12. Claim element 1(c) of the '285 patent contains "means plus function" language. Such language limits the scope of the claim. *See* 35 U.S.C. § 112, ¶ 6; *Valmont Indus., Inc. v. Reinke Mfg Co.,* 983 F.2d 1039 (Fed.Cir.1993). For a means-plus-function claim element to read on an accused device, "the accused device must employ means identical to or the equivalent of the structures, material, or acts described in the patent specification. The accused device must also perform the identical function as specified in the claims." *Id.* at 1454. Under section 112, an equivalence is "an insubstantial change which adds nothing of significance to the structure, material, or acts disclosed in the patent specification." *Id.* at 1455.

13. The "means mounting" the tie members to the base, in element 1(c) of the '285 patent and embodied in MDDK component part 50, is properly construed to be a layer or pad that spaces the tie member from the base; it prevents the grinding forces and vibration that pass through the tie member from reaching the base. *See* PX 1, col. 12 ("The roll assembly is supported not directly but by way of a damping intermediate layer 50. This particular measure was not possible in the known constructions of roller mills used in milling, since otherwise the grinding gap could not be controlled."); PX 2, col. 12 (same); PX 1, col. 13 ("A damping intermediate layer is constructed as a thin plate 73 in Fig. 5."); PX 2, col. 13 (same); PX 1 & 2, fig. 4, 5; DX 599; DX 600; FF 14, 24. This damping layer need not necessarily be made of any particular material so long as it does not conduct grinding forces and vibrations from the tie member to the base. *See* PX 1 & 2, col. 4, 13; Turner Tst.

14. Claim element 1(c) of the '285 patent, the "means mounting said tie members on said base," is not literally infringed by Defendants' LAM machine. *See* FF 24–28. No structure on the LAM identically performs the function of separating the C-plate from the frame to confine the forces in a closed loop away from the frame. *See* FF 26–27.

The bolts and pins attaching the C-plate to the frame are not equivalent to the MDDK pad. They do not space the C-plate from the frame; rather, they bond the C-plate to the frame, metal to metal, so that the forces are transferred from the C-plate to the frame. *See id.*

15. The "levers", in claim element 1(g) of both patents and embodied in MDDK component 38, are and must be pivotally mounted on the stationary bearing, part 26, and not on another structural component. *See* PX 1, col. 18; PX 2, col. 19; PX 1 & 2, fig. 4; CL 7–8, 18, 21; FF 32–34.

16. Element 1(g) of the '285 patent, the "pair of levers each pivotally mounted on a different one of said stationary bearings," is not literally infringed by Defendants' LAM machine. Similarly, element 1(g) of the '083 patent, the "lever means pivotally mounted on one of said bearing housings," is not infringed by the LAM machine. Contrary to the recital of Claim 1, which requires attachment of the lever to the bearing housing, the corresponding lever on the LAM machine is attached directly to the C-plate. *See* FF 32–34. In that position, the LAM's lever is instrumental in transmitting to the cast-iron frame the heavy concentration of grinding forces the lever receives. *See* FF 33, 50, 52. Accordingly, the placement of the lever is crucial to the relative confinement or nonconfinement of the force; the distinction between the location of the claim elements and the LAM lever is therefore significant.

17. The "pair of adjustment members" in claim element 1(h) of the '285 patent and the corresponding "screw adjustment device" in element 1(g) of the '083 patent are and must be mounted on the tie member and not the base, so as to accomplish the closed loop of forces and the structural independence of the roll package. *See* PX 1 & 2, fig. 4; CL 7–8; FF 35–38.

18. Claim element 1(h) of the '285 patent, the "pair of adjustment members each mounted on a different one of said tie members," is not literally infringed by Defendants' LAM machine. Similarly, element 1(g) of the '083 patent, the "screw adjustment device operatively arranged between

said lever means and said tie member," is not infringed by the LAM machine. *See* FF 35–39. The placement of this "fine adjustment screw" in the MDDK is crucial in containing the grinding forces in the subassembly and in allowing the roll package to be maintained and replaced independently of the base. *See* FF 50. In the LAM, as in the prior art relevant to claim allowance, the corresponding component is attached directly to the cast-iron frame. *See* FF 35–36, 64. In that position, it both transmits a portion of the grinding forces to the frame and, in part, prevents the subassembly from being removable as a unit. *See* FF 14, 35.

19. The "fixed and movable bearing housings being respectively mounted on said tie member independently of said main base frame," in element 1(g) of the '083 patent are and must be mounted on the tie member in a manner to maintain their independence from the base. The housings must not be attached to the base in such a way that removal of the subassembly as a unit is impaired. *See* PX 2, col. 18–19; CL 7, 8.

20. Claim element 1(g) of the '083 patent, "fixed and movable bearing housings being respectively mounted on said tie member independently of said main base frame," is not infringed by the LAM machine. In the LAM machine, the bearing housings are permanently attached to the frame by way of the C-plate. They are not independent from the frame in any sense. See FF 14, 20, 50, 55.

21. The variations between each patent claim element and its corresponding component of Defendants' LAM machine are not minor, but rather are significant. *See Chaparral Indus., Inc. v. Boman Indus, Inc.,* 697 F.Supp. 1113, 1123 (D.C.Cal.1988). The variations are fundamental to the specifications and to the uniqueness of the patents in suit over the prior art. *See* FF 17–20, 23–39, 41–45, 48–50, 55, 64–67; CL 7–8, 38 & n. 4.

22. Because one or more elements of the sole independent claims of each patent in suit are not infringed, Plaintiffs have not proved by a preponderance of the evidence that the LAM roller mill literally infringes the patents in suit. *See Becton,* 922 F.2d at 796; FF 15–16; CL 11, 14, 16, 18, 20.

23. Infringement under the doctrine of equivalents requires a showing that the accused device performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed device. *Miles Laboratory, Inc. v. Shandon, Inc.,* 997 F.2d 870 (Fed.Cir. 1993); *Atlas Powder,* 750 F.2d at 1579.

> Although designing or inventing around patents to make new inventions is encouraged, piracy is not: Thus, where an infringer, instead of inventing around a patent by making a substantial change, merely makes an insubstantial change, essentially misappropriating of even "stealing" the patented invention, infringement may lie under the doctrine of equivalents.

*London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed.Cir.1991). Infringement by equivalents is the exception and not the rule. *Id.* at 1538; *see Charles Greiner & Co. v. Mari–Med Mfg., Inc.,* 962 F.2d 1031, 1036 (Fed.Cir.1992); *Malta v. Schulmerich Carillons, Inc.,* 952 F.2d 1320, 1328 (Fed.Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992); *see also International Visual Corp. v. Crown Metal Mfg. Co.,* 991 F.2d 768, 774 (Fed.Cir.1993) (Louri, C.J., concurring).

24. Inspections of competing products and consequent enhancement of knowledge are unavoidable and even desirable in the marketplace; they do not necessarily rise to the level of patent infringement. *See Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 932 F.2d 1453, 1457 (Fed.Cir.1991) ("Intentional 'designing around' the claims of a patent is not by itself a wrong which must be compensated by invocation of the doctrine of equivalence."); *State Indus., Inc. v. A.O. Smith Corp.,* 751 F.2d 1226, 1235–36 (Fed. Cir.1985) ("[K]eeping track of a competitor's products and designing new and possibly better or cheaper functional equivalents is the stuff of which competition is made and is supposed to benefit the consumer."); *Sterner Lighting, Inc. v. Allied Electrical Supply, Inc.,* 431 F.2d 539, 543–44 (5th Cir.1970) ("[E]vidence that an alleged infringer produced his device in response to the success of a patented invention may well be misleading,

since every person has the right to compete with the producer of a patented device if only he obtains his results by means different from those of the patented object."), *cert. denied*, 401 U.S. 909, 91 S.Ct. 869, 37 L.Ed.2d 807 (1971).

25. An equitable defense to a claim for infringement by equivalents is prosecution history estoppel, or "file wrapper" estoppel. A patent owner cannot recapture claim scope in litigation that the owner deliberately surrendered before the United States Patent Office to obtain the patent. *Brenner v. United States*, 773 F.2d 306, 307–08 (Fed. Cir.1985); *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362–63 (Fed.Cir. 1983); *see Jonsson v. Stanley Works*, 903 F.2d 812, 814 (Fed.Cir.1990). Prosecution history estoppel must be applied on a case-by-case basis. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870 (Fed.Cir.1985); *Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*, 738 F.2d 1237, 1243 (Fed.Cir. 1984).

26. The prosecution history in this case demands a narrow range of equivalents for both patents. *See* FF 28, 34, 37, 41–46. The crowded nature of the art, and the similarities between the LAM machine and prior art, similarly restrict the scope of possible equivalents. *See Slimfold*, 932 F.2d at 1457; FF 41, 47–48, 50, 55.

27. Plaintiffs have not proved by a preponderance of the evidence that the LAM roller mill infringes the patents in suit under the doctrine of equivalents. The LAM roller mill, compared to Plaintiffs' MDDK as patented, does not grind grain in the same way with the same result. The MDDK grinds grain at high speed with high throughput capacity, easier maintenance, and reduced noise by confining the grinding forces to a roll package that is independent from the base. Of those results, the LAM has improved speed and throughput capacity to compare with the MDDK. See FF 47–48, 68. The crucial distinction is this, however: the means by which the MDDK achieves those results is to isolate the roll package from the base; the means by which the LAM achieves those results is to reinforce the frame to tolerate the increased load. See FF 17–19, 23, 25, 50. Plaintiffs submitted no probative evidence quantifying the amount of grinding forces, if any, that are confined to the LAM's C-frame. *See* FF 51, 57–58. Furthermore, other results of the two inventions are profoundly dissimilar: the MDDK has an independently maintainable roll package with substantially decreased noise; the LAM accomplishes neither. Because the LAM's C-plate, lever means, screw adjustment device, and the bolts mounting the C-plate to the frame all act to transmit the grinding forces to the frame, they do not function either in the same way or with the same result as the "corresponding" MDDK claim element, each of which assists in closing the loop of forces to the independent roll package. *See* FF 23–39. The LAM frame does not perform the same function as the MDDK base. *See* FF 23. It is true that the LAM roll assembly resembles the MDDK in appearance more than it resembles its own predecessor, the LKK. *See* DX 341, 343, 344C. Primary similarities between the LAM and the MDDK, however, such as the horizontal rollers and the parallel orientation of the engagement-disengagement device, are not Claim 1 elements of the patents in suit. See FF 48–49.

## B. EXCEPTIONAL CASE

28. In an "exceptional case," the district court may award reasonable attorney's fees to the prevailing party. 35 U.S.C. § 285. Among the grounds for finding a case to be exceptional are a patent owner's inequitable conduct, vexatious or unjustified litigation, misconduct during litigation, or the filing and prosecution of a groundless suit. *See Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed.Cir.1990); *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 455 (Fed.Cir.1985).

29. Some basis exists for finding this case to be exceptional under 35 U.S.C. § 285. See FF 56–60. After consideration, however, the Court declines to award attorney fees to Defendants.

## C. INVALIDITY

30. Patents carry a presumption of validity. 35 U.S.C. § 282. The burden is on

Defendants to prove invalidity by clear and convincing evidence. *American Hoist and Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358–59 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

31. The "clear and convincing evidence" standard requires more certainty than a "preponderance of the evidence" standard but less than a finding of "beyond a reasonable doubt." *Neely v. City of Grenada*, 799 F.2d 203, 207 (5th Cir.1986).

32. Inequitable conduct is a basis for declaring a patent to be invalid. *Standard Oil*, 774 F.2d at 453. The claim of inequitable conduct has three elements: (1) failure to disclose material information to the patent examiner; (2) knowledge of material information; and (3) intent to deceive. *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1420 (Fed.Cir.1989). The undisclosed art is material if a reasonable patent examiner would have considered it important in deciding whether to issue the patent. *Id.* at 1421. The intent to deceive can be shown by circumstantial evidence. *Id.* at 1422.

33. Neither patent in suit is invalid for inequitable conduct. *See Merck*, 873 F.2d at 1420. Although the Ganz machine is a relevant and material known reference that Plaintiffs failed to disclose to the Examiner, *see* FF 62, 65–66, Defendants have not shown by clear and convincing evidence that Plaintiffs withheld it from the Examiner with the intent to deceive.

34. A patent may be declared invalid if it fails to meet the requirement of nonobviousness:

> A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103.

35. To determine whether the MDDK invention is obvious in light of prior art, the Court must make the following evaluations: (1) the scope and content of the prior art; (2) the differences between the invention as claimed and the prior art; (3) the level of ordinary skill in the art; and (4) whether there are any secondary, objective indicia of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966); *Loctite*, 781 F.2d at 872.

36. The hypothetical person of ordinary skill in the art is presumed to be aware of all pertinent prior art. *Standard Oil*, 774 F.2d at 454. The person of ordinary skill "thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights." *Id.* at 454. The pertinent level of ordinary skill in the art is measured as of the date of the invention. *In re Kaplan*, 789 F.2d 1574, 1580 (Fed.Cir. 1986); *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 959 (Fed. Cir.1986).

37. Objective indicia of nonobviousness can include commercial success, the long-felt need for the invention, and the failure of others to achieve the patented result. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed.Cir.1983).

38. Defendants have not proved by clear and convincing evidence that the patents in suit, as construed narrowly above, are invalid for obviousness.[4] The person of ordinary skill in the art of roller mill design has not, and could not without substantial time and research, come up with the MDDK invention. *See* FF 68–74. Supporting this conclusion is the fact that the Ganz technology has existed since 1924; no inventor since then has been able to combine it with other relevant art to invent a machine comparable

---

4. To the extent that Claim 1 of each patent in suit is construed broadly enough to read on the LAM machine, the patents in suit are invalid for obviousness in light of the prior art. *See* FF 62–64, 66–67.

to the MDDK. See FF 66, 73, 75. Although roller mills all perform the same function in the same general way, the differences between the narrowly construed claims of the MDDK and the prior art are significant, particularly with regard to the closed loop of forces and the independence of the subassembly. No other roller mill has demonstrably achieved those accomplishments; nor are those results obvious by considering the prior art in combination. *See* FF 66, 68–71, 75. Moreover, all of the objective indicia of nonobviousness are present in this case. *See* FF 75–76.

## D. ANTITRUST

■ 39. Attempted enforcement of patent infringement when a patent is obtained by inequitable conduct may amount to an unlawful attempt to monopolize, provided that the other elements necessary for a violation of Section 2 of the Sherman Act are also present. *Walker Process Equipment, Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 176–77, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965).

■ 40. For the remaining elements of a Section 2 claim, the Court must determine the relevant product market, Plaintiffs' relative market power within that market, and whether Plaintiff had the specific intent to monopolize. *See Walker Process*, 382 U.S. at 177–78, 86 S.Ct. at 350–51; *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 994–96 (9th Cir.1979) [*"Handgards I "*], *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); August 6 Order at 24. Monopolization has two elements: (1) possession of market power; and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *see Domed Stadium Hotel,* 732 F.2d at 487. Monopoly power is "the power to control prices or exclude competition." *Grinnell,* 384 U.S. at 571, 86 S.Ct. at 1704 (quoting *American Tobacco Co. v. United States,* 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946)). Market power may ordinarily be inferred from a predominant share of the market. *Id.* at 571, 86 S.Ct. at 1704.

■ 41. The relevant market has both geographic and product dimensions. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 487 (5th Cir.1984). The geographic market in this patent case is limited to the United States. *See Handgards, Inc. v. Ethicon, Inc.,* 743 F.2d 1282, 1293 (9th Cir.1984) [*"Handgards II"*], *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985); *Wahl v. Rexnord, Inc.,* 481 F.Supp. 573, 588–89 (D.N.J.1979), *rev'd on other grounds,* 624 F.2d 1169 (3rd Cir. 1980); *Prelin Indus., Inc. v. G & G Crafts, Inc.,* 357 F.Supp. 52, 70 (W.D.Okla.1972). The limitation reflects the view that the United States is the "only geographic market where a U.S. patent can be 'misused' in a manner leading to antitrust violations, as first articulated in *Walker.*" August 6 Order, at 25–26.

■ 42. The relevant product market must include products with a "reasonable interchangeability." *United States v. E.I. Du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). To decide whether products are reasonably interchangeable, the Court must evaluate (1) functional interchangeability; (2) responsiveness of the sales of one product to the price changes of the other; and (3) degree of competition from the potential substitute. *Yoder Bros., Inc. v. California–Florida Plant Corp.,* 537 F.2d 1347, 1366 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). If the differences in products' "price, use, and qualities" are too great, then they cannot be reasonably interchangeable. *Id.* at 1366.

■ 43. The relevant market in this case includes sales of American and European roller mills in the United States. *See* FF 77. It is clear from the evidence that, even though the Europeans describe the American machines as "Model Ts" in comparison to the European ones, they are reasonably interchangeable. They perform the same function at about the same overall cost (including the higher labor cost associated with operating the American mills). *See* FF 78. More-

over, American roller mills compete head-to-head for sales to American millers, who typically consider both types before purchase. FF 79–80. A market defined as European roller mill sales in the United States would be subject to unacceptably significant changes in market share as the result of a single sale. *See* FF 82.

■ 44. Plaintiff is not guilty of monopolization under Section 2 of the Sherman Act. *See Domed Stadium,* 732 F.2d at 490; *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.,* 679 F.2d 516, 521 (5th Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983). Although Plaintiffs are guilty of inequitable conduct, Plaintiffs have a legally insignificant relevant market share of less than 10%. *See Domed Stadium,* 732 F.2d at 490; August 6 Order; FF 81.

■ 45. Even if the market were defined to consist of new European roller mills sold in the United States, Defendants' antitrust claim must fail. Plaintiffs have, at most, a 60% share of that market. No inference of domination can be made from that number alone. *See United States v. Aluminum Co. of Am.,* 148 F.2d 416, 420 (2d Cir. 1945) (holding that while 90% market share is enough to constitute monopolization, "it is doubtful whether 60 or 64 percent would be enough"); *see also American Tobacco,* 328 U.S. at 811–14, 66 S.Ct. at 1139–41 (adopting Judge Learned Hand's opinion in *Aluminum Co.*). *See* FF 82. Furthermore, any "market power" Plaintiffs would have in that more narrowly defined market is primarily a result of other factors, such as superior service and length of time in the market. *See* FF 85–86. That Defendants have been able to enter the market in this country and to build a market share of over 10% among non-American companies since the mid-1980s belies any monopolization on Plaintiffs' part. *See* FF 82. The trend clearly shows increased entries to the market and a weakening of Plaintiffs' relative strength. *See* FF 82–84.

■ 46. The elements of attempted monopolization are (1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt to monopolize the market will be successful. *Domed*

*Stadium,* 732 F.2d at 490; *Dimmitt,* 679 F.2d at 525. Specific intent to monopolize may be inferred from a finding of bad faith. *Handgards II,* 743 F.2d at 1293.

■ 47. For the second element of attempted monopolization, an entity "must have some legally significant share of the market before he approaches the level of dangerous probability of success." *Domed Stadium,* 732 F.2d at 490 (noting that a market share of 10% or less is insufficient as a matter of law). Factors, other than market share, that may be evaluated are "concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend." *Id.* at 490.

■ 48. Plaintiff is not guilty of attempted monopolization. Plaintiff has no dangerous probability of monopolizing the relevant market for American and European roller mills in the United States. Plaintiff's market share is legally insignificant at this time. *See Domed Stadium,* 732 F.2d at 490; FF 81. The Court does not reach the issue of specific intent.

■ 49. Even if the market were more narrowly defined to be sales of European roller mills in the United States, Defendants would have no dangerous probability of monopolization. The evidence clearly shows a trend of increased entries to the market, a strengthening showing by the sellers already there, and, at least for this year, a weakening showing by Plaintiffs. *See* FF 82–84.

### E. LANHAM ACT

■ 50. For the claim of misrepresentation under the Lanham Act, Defendants must prove by a preponderance of the evidence (1) that Plaintiffs in their commercial advertising or promotion materially misrepresented or described Defendants' product; and (2) that the material misrepresentation or description was false or verifiably misleading. *See* 15 U.S.C. § 1125(a); *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 231 (3rd Cir.1990).

■ 51. Defendants' Lanham Act claim fails as a matter of law. Defendants have submitted no evidence of commercial adver-

tising or promotion by Plaintiffs as would support a claim for misrepresentation. *Cf.* FF 87.

## F. INTERFERENCE WITH CONTRACT

■ 52. To show a prima facie case for interference with an existing contract, Defendants must prove the following:

(1) that a contract subject to interference existed;

(2) that the act of interference was willful and intentional;

(3) that such intentional act was a proximate cause of Plaintiff's damages; and

(4) that actual damage or loss occurred.

*Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991).

■ 53. Defendants did not prove that Plaintiffs tortiously interfered with an existing contract. Defendants have offered no probative evidence of interference with the sole proved contract at issue. *See* FF 88.

■ 54. The elements of interference with a prospective contract follow:

(1) a reasonable probability that the parties would enter into a contractual relationship;

(2) malicious conduct by the defendant intentionally preventing the relationship

from occurring, with the purpose of harming the claimant;

(3) without privilege or justification;

(4) that results in actual harm or damage.

*Verkin v. Melroy,* 699 F.2d 729, 732 (5th Cir.1983).

■ 55. Defendants did not prove that Plaintiffs tortiously interfered with a prospective contract. As Defendants acknowledge, they have produced no evidence of the reasonable probability of a prospective contract with which Plaintiffs' infringement lawsuit has interfered.

## III. CONCLUSION

For the reasons given above, Plaintiffs take nothing on their claim of infringement. Defendants take nothing on their counterclaims of invalidity, patent misuse, antitrust, misrepresentation, and tortious interference with contract. A final judgment will issue separately.

The principal issue tried before the Court was the claim of infringement of the patents in suit. On this issue, Defendants are the prevailing parties. Accordingly, Plaintiffs shall bear the costs of this lawsuit. *See* Fed.R.Civ.P. 54(d).

SO ORDERED.

1328

# Buehler '285 Roll Package

Connecting Member, 32

Overload Spring (Yielding Means), 51

Lever Pivotally Mounted, 39 on Stationary Bearing

Stationary Bearing, 26

Lever, 38

Movable Bearing, 23

Movable Roll, 20

Stationary Roll, 21

Tie Member, 27

Tie Member, 27

Base, 29

Base, 29

Base, 29

Means Mounting Tie Member on Base in Spaced Parallel Relationship/ Vibration Damping Layer, 50

Tie Member, 27

Adjustment Screw, 42 Mounted on Tie Member

Means Mounting Tie Member on Base in Spaced Parallel Relationship/ Vibration Damping Layer, 50

Space Between Tie Member, 27 and Base, 29

## ATTACHMENT B
# Buehler '083 Roll Package

Over Load Spring (Yielding Means), 51

First Roll Gap Adjusting Means, 32,35-37

Lever Pivotally Mounted, 39 on Stationary Bearing Housing

Lever Means, 38 (Second Roll Gap Adjusting Means)

Movable Bearing Housing, 23

Stationary Bearing Housing, 26

Tie Member, 27 Independent from/of Main Base Frame

Tie Member, 27

Main Base Frame, 29

Vibration Damping Layer, 50 Enabling Independent Mounting/ Operation

Tie Member, 27 Independent from/of Main Base Frame

Screw Adjustment Device, 42 Arranged Between Lever and Tie Member (Second Roll Gap Adjusting Means)

Vibration Damping Layer, 50 Enabling Independent Mounting/ Operation

## ATTACHMENT C
# Ocrim LAM Roll Support

### *JUDGMENT*

This case was tried before the Court beginning July 6, 1993. Judgment is entered pursuant to the Court's Memorandum Opinion and Order of August 17, 1993.

IT IS ORDERED, ADJUDGED AND DECREED by the Court

(1) that Plaintiffs Buehler AG and Buhler, Inc., take nothing by their suit against Defendants Ocrim S.p.A., Ocrim America, Inc., and Farmers Elevator of Dawn, Inc.;

(2) that Defendants Ocrim S.p.A., Ocrim America, Inc., and Farmers Elevator of Dawn, Inc., take nothing in their countersuit against Plaintiffs Buehler AG and Buhler, Inc.; and

(3) that this lawsuit be and it is hereby, **DISMISSED** on the merits at Plaintiffs' cost.