**HERR–VOSS CORPORATION, Plaintiff,**

v.

**DELTA BRANDS, INC. and Samuel F. Savariego, Defendants.**

Civ. A. No. 3:92–CV–0891–P.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 31, 1995.

**36**

Daniel V. Thompson, P. Talmage Boston, Jr., Dallas, TX, for defendants.

Robert D. Yeager, Kirkpatrick & Lockhart, Pittsburgh, PA, David H. Judson, Hughes & Luce, L.L.P., Dallas, TX, for plaintiff.

## MEMORANDUM OPINION and ORDER

SOLIS, District Judge.

A six-day nonjury trial was held in this patent case beginning March 21, 1995. After a careful review of the evidence presented at trial and the applicable law, the Court finds that there was no infringement of the United States Patent No. 4,614,101. The Court also finds the United States Patent No. 4,614,101 is invalid.

### BASIS OF SUIT

Plaintiff, Herr–Voss Corporation ("Plaintiff") claims that the defendants, Delta Brands, Inc. and Samuel F. Savariego ("Defendants") induced infringement of the patent in suit, U.S.Patent No. 4,614,101 ("the '101 patent"), and that such acts of inducing infringement were willful. Plaintiff asserts that this is an exceptional case based on its claim that Defendants willfully induced infringement of the '101 patent.

Defendants deny that they have induced infringement, and claim that the '101 patent is invalid. Defendants assert that this is an exceptional case based on their claim that Plaintiff's claims are frivolous.

### STIPULATED FACTS

1. The '101 patent, entitled "Method of Rewinding Slit Metal Strands," was issued on September 30, 1986.

2. The '101 patent names Augustine A. Fornataro as inventor. Mr. Fornataro is the President of Herr–Voss, Plaintiff.

3. Plaintiff is the owner of the '101 patent and has been since its issuance.

4. The invention claimed in the '101 patent relates to a method for rewinding slit metal strands.

5. A significant portion of the business of both Plaintiff and Defendants is the manufacture of machinery to alter and/or to improve the characteristics of strip material starting with a master coil and ending with coils suitable for the user's intended purpose.

6. Flat–Rolled Steel Products constitute a major classification of steel products. Flat-rolled products include sheet, strip, plate, etc.

7. There are two major categories of flat-rolled products: (1) hot-rolled products are reduced to final thickness by heating and rolling at elevated temperatures; (2) cold-rolled products are really "cold finished" products since most of the earlier thickness reduction occurs while the product is hot. Cold rolling is carried out on products which have not been heated immediately prior to the cold-rolling operation when they are reduced to final thickness.

8. Strip, hot-rolled or cold-rolled, is produced in very long length with width up to twelve feet and with the thickness of strip ranging from 0.005 inches to 0.250 inches.

Given the long length of strip, it is usually stored in a coil.

9. A master coil is a coil of strip whose width is essentially the same as it was at the completion of the rolling process in the steel mill. A master coil may be converted into two or more coils of narrower width by making continuous cuts along the length of the strip in a slitting process.

10. The equipment used in a slitting process generally includes a payoff reel to support the master coil for purposes of feeding the full width of the master coil into a slitter which employs pairs of opposed circular knives to slit or shear the full width strip into multiple strands (or "mults") of desired widths.

11. The individual strands are rewound as coils on a rotating mandrel called a recoiler. These slit coils are produced for a consumer user who in turn produces steel forms or shapes by a variety of blanking or forming techniques.

12. A slitting line typically includes a payoff reel, a slitter and a recoiler.

13. The objective of the slitting operation is to process a master coil supported on the payoff reel by controlling the strip so that it is continuously fed through the knives of the slitter, where it is slit into the desired number of mults and widths, and, finally, to rewind the multiple strands onto the recoiler.

14. In order that the multiple coils produced by the slitting process may be further processed safely and conveniently by an end user, it is desirable that each of the coils be tightly wound and secured by applying a circumferential strap or band so that the individual coil can be removed from the recoiler mandrel and transported to the end user without fear of the coil unraveling.

15. The production of tightly wound coils on the recoiler or a slitting line is usually complicated by the profile of strip of the master coil typically produced in the steel mill. Steel strip from a master coil rarely has consistent thickness.

16. Across the width of the strip, the edges of the strip are almost always thinner than the center. This center "crowning" is the result of the rolling process in the steel mill. Although every attempt is made to reduce strip crowns, crown remains in varying degrees in all strip.

17. In the slitting process, the payoff reel serves two functions: (1) it supports the coil of strip on a rotatable mandrel and (2) it provides the necessary back tension for controlling and/or recoiling the strip.

18. The recoiler in a slitting line recoils the slit mults on a mandrel. The recoiler is driven by a motor which, in effect, pulls the slit mults toward the recoiler against the back tension provided by the payoff reel and other devices in the slitting line.

19. The slitter may be driven by its own motor or may be undriven. If the slitter is undriven, then power for slitting is provided by the recoiler pulling the mults through the slitting knives.

20. In the slitting process, the strip from the master coil moves through the slitter at one velocity and all of the strands provided by the slitter exit the slitter at the same velocity. The resulting strands have varying thicknesses that result from the crown of the strip.

21. Because the rotational speed of the recoiler is the same across the width of the mandrel on which the slit strands are recoiled, the recoiler makes the same number of wraps for each strand being recoiled. However, the varying thickness of the strands results in the diameter of the coils of thicker strands increasing at a rate greater than the growing diameters of the thinner strands.

22. These diameter differences cause each mult to be wound at a velocity that is proportional to the particular diameter of the coil being formed on the mandrel.

23. These differences in velocity of the mults cause the pull of the recoiler to migrate to the thicker strands associated with the larger diameter coils, leaving the thinner strands loose.

24. The migration of tension to the thicker strands results from their being wound at a higher velocity relative to the thinner strands thus generating slack at the thinner strands

causing the thinner strands to droop and wind up loosely on their respective coils. Such loose coils are unacceptable to the end user because they can neither be handled safely nor processed readily in subsequent operations.

25. Neither Plaintiff nor Defendants have ever possessed the capability of fully testing slitting equipment at their facilities.

26. Plaintiff tested the patented method at the facilities of Samuel, Son & Company ("Samuel, Son") in Ontario, Canada, in the late 1976—early 1977 time frame and in June of 1980.

27. Mr. Fornataro filed the application for the '101 patent on December 1, 1981.

28. The application was prosecuted in the U.S. Patent and Trademark Office ("PTO") through several rejections by the Examiner on various grounds.

29. After a final rejection by the Examiner, Plaintiff appealed the rejection to the Board of Appeals of the PTO. The Board reversed the Examiner's rejections and the '101 patent issued.

30. The '101 patent contains five claims, but only the first four are placed in issue by Plaintiff.

31. In 1987, Steel Warehouse of Wisconsin, Inc. ("Steel Warehouse") was an active customer of Delta.

32. After a written quotation was submitted by Defendant Savariego to Steel Warehouse on July 6, 1987, Steel Warehouse ordered the first Delta Equalizer for its strip processing line at a price of $450,000.00.

33. Defendant Savariego was the author of the brochure entitled "Equalizer" that was used by Defendants early on to market its product.

34. There is no dispute that Defendants initially encouraged Steel Warehouse to use the Delta Equalizer in both full-width and slitting operations.

35. Defendants commenced the manufacture of the first Equalizer for Steel Warehouse in July 1987 and completed it in March 1988. On March 14, 1988, the equipment specified in Defendants' quotation, including the first Equalizer, was shipped to Steel Warehouse and thereafter was installed in the Milwaukee, Wisconsin facility of Steel Warehouse. Defendants sold another Equalizer as part of a slitting line to Huntco Steel, Inc., in Arkansas; Plaintiff has no evidence at present that the use of that Equalizer has infringed the claims of the '101 patent.

36. The equipment Defendants sold to Steel Warehouse, which included the Equalizer, was designed to permanently elongate and tightly wind both full-width and slit mults of steel. The parties are in dispute as to whether the Equalizer was in fact capable of working with slit material.

37. In 1988, Mr. Leroy Lance was assigned by Defendants to be the responsible field service technician for the Delta Equalizer at Steel Warehouse.

## STIPULATIONS OF LAW

1. If Delta Brands, Inc. is liable for inducing infringement of a claim of the '101 patent, then Savariego is individually, jointly and severally liable therefor as a result of his controlling position at Delta Brands, Inc.

2. Defendants are liable for inducing infringement if the Court concludes (1) Steel Warehouse has directly infringed the '101 patent and (2) the patent is valid.

3. Plaintiff's testing activity at Samuel, Son raises no prior art bar to the patentability of the claims of the '101 patent. Defendants contend that the testing is highly relevant to the Best Mode defense.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

### I. INFRINGEMENT

1. One who actively induces infringement of a patent shall be liable as an infringer. 35 U.S.C. § 271(b). Plaintiff bears the burden of proving by a preponderance of the evidence that Defendants infringed the '101 patent. *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 868 (5th Cir.1973) (citations omitted); *Buehler AG v. Ocrim*, 836 F.Supp. 1305, 1319 (N.D.Tex.1993) (*citing Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758

(Fed.Cir.1984)). (*See attached* U.S.Patent No. 4,614,101 and Prior Art Statement.)

2. A determination of literal infringement requires the court, as a matter of law, to construe the patent's claims for the scope of the invention and then determine whether a claim "reads on" the accused device. *Buehler AG*, 836 F.Supp. at 1319 (*citing Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985)).

3. The patent's specification is the primary source for construing the words of a patent's claim elements. *Id.* (*citing Arachnid, Inc. v. Medalist Mktg. Corp.*, 972 F.2d 1300, 1302 (Fed.Cir.1992)). Unless specifically stated, a claim is not limited by references to a preferred embodiment or to an advantage of the invention. *Id.* (citations omitted).

4. The court may utilize extrinsic evidence to assist in the claim construction. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed.Cir.1995). Extrinsic evidence includes expert and inventor testimony, dictionaries, and learned treatises, which may be helpful in ascertaining the meaning of scientific principles, technical terms and terms of art that appear in the patent and prosecution history. *Id.* at 980.

5. However, "[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim [of the patent]." An objective test of what one of ordinary skill in the art at the time of the invention would have understood a disputed claim term to mean is the focus in claim construction. *Id.* at 985–986.

6. The failure of an allegedly infringing device to read on even a single claim limitation negates literal infringement. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed.Cir.1991).

7. To protect the patentee against devices incorporating insignificant changes to avoid literal infringement, the courts formed the doctrine of equivalents, finding an accused invention performing substantially the same function in substantially the same way to obtain the same result infringes on the patent. *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 868 (5th Cir.1973).

8. A finding of equivalence is a determination of fact involving a question of law, the construction of the patent. *Continental Oil Co. v. Cole*, 634 F.2d 188, 198 (5th Cir.1981).

9. Patent claims are to be construed in light of the description and to cover the real invention found in the specification and drawings. *Ziegler*, 483 F.2d at 869.

10. Equivalency is determined by examining the scope of the prior art, which is the essence of the invention and the advancement afforded by the invention. *Continental Oil*, 634 F.2d at 191. A pioneer patent commands broader protection than a patent merely improving upon what is already known. *Id.*

11. Equivalency "does not require complete identity for every purpose and in every respect.... Consideration must be given to the purpose for which an ingredient is used in a patent, the equalities it has when combined with the other ingredients, and the function which it is intended to perform." *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

12. The claims define the scope of the protection afforded by a patent. *Ziegler*, 483 F.2d at 869.

13. Claim 1 of the '101 patent describes a method of coiling three or more metal strands into uniformly tight coils. *See* PX 1 ('101 patent), col. 1 ("This invention relates to the rewinding of strands ... into uniformly tight coils ..."). The stipulated facts and extrinsic evidence supports Defendants' assertion that the term "multiple strands" in Claim 1 is shackled to the meaning of the term of art "mults" which means three or more strands. The scope of the '101 patent encompasses the method of slitting steel into three or more strands and does not encompass splitting operations which produce two strands.

14. Claim 1 of the '101 patent further intended the strands to be selectively worked

while moving through the process of reverse bending. *See* PX 1, col. 2 ("I preferably work the strands selectively by subjecting them to repeated reverse bending under tension less than the tensile yield strength of the metal.").

15. Recognizing that the tension of the pay-off reel, slitter, and recoiler alone is insufficient to elongate and thin the strands, Claim 1 of the '101 patent intends the stated sources of tension must be combined with repeated reverse bending of the strands to achieve the result of elongation and thinning of thicker strands relative to the thin. *See* PX 1, col. 2 ("Tension in the strands . . . is a function of the current supply to the drive motors of the pay-off reel, slitter, and recoiler, the work of the slitting process, and the work associated with the repeated bending strain reversals. . . . While tension alone below the tensile yield strength of the metal will not elongate and thin the strands, tension in combination with repeated bending reversals of the strands can elongate them and reduce their thickness."); PX 1, col. 3 ("The net effect is to elongate and thin the thicker strands relative to the thin, which is an object of this invention.").

16. Claim 2 of the '101 patent is intended to specify that, utilizing the method of claim 1, the thicker strands are not permanently deformed to substantially the same thickness as the thinner strands. *See* PX 1, col. 2 (". . . I selectively work the strands so as to elongate and simultaneously thin out the thicker strands more than the thinner strands."). There was much dispute by the parties as to this issue. Ultimately, the Court is persuaded by the language in the prior art statement that distinguishes the patent in suit from the Kinnavy patent. The language used to describe the '101 patent is:

> The method of selectively working the strands comprises subjecting all strands to reverse bending while applying tension thereto less than the tensile yield strength of the strands. The thicker strands thereby elongated more than the thinner strands.
> The Kinnavy patent discloses a method of permanently elongating strip by applying tension thereto and reverse bending it so

as to exceed the yield strength of the metal. It does not deal with the tensioning of slit strip in multiple.

17. The Court finds this language to describe two primary distinctions between the patent in suit and the Kinnavy patent. First, the Kinnavy patent worked by permanently elongating strip, that is in the plastic range of the metal, while the '101 patent works by temporarily elongating the metal, that is in the elastic range. Second, the '101 patent method applied to multiple strands of slit metal, while the Kinnavy patent worked only with a single strip or uncut metal.

18. The Court is not persuaded by Plaintiff that the term "elongate" without a modifier means "permanent elongation" in the industry. The term can mean both permanent and temporary elongation. The language used by Mr. Fornataro in the prior art statement suggests he was describing his process as utilizing temporary elongation as opposed to Kinnavy's method utilizing permanent elongation.

19. Claim 3 of the '101 patent describes selective working of the strands, utilized in the method of Claim 1, as the combination of reverse bending and tension below the tensile yield strength of the metal. *See* PX 1, col. 2 ("I preferably work the strands selectively by subjecting them to repeated reverse bending under tension less than the tensile yield strength of the metal.").

20. Claim 4 of the '101 patent specifies that the reverse bending of Claim 3 is effectuated by passing the strands between an unspecified number of parallel but offset rolls. PX 1, col. 2 ("Those strands are passed through a strand tensioning apparatus comprising a plurality of parallel upper rolls, offset respectively in the direction of strand travel from a plurality of parallel lower rolls, but overlapping them in the path of strand travel so as to bend the strand downwardly and upwardly in reverse fashion as the strands pass through the rolls.").

21. Plaintiff's evidence fails to establish that the repeated reverse bending element of Claim 1 reads on the accused process. The '101 patent effectuates the elongation and thinning of metal strands by combining

tensions from the pay-off reel, slitter, and recoiler with the tension created in the repeated reverse bending. The accused process cannot be found to read on to the '101 patent because the accused process achieves thinning and elongation through the application of sheer tension above the yield strength in the pull of the recoiler. Additionally, the '101 patent works the strands for elastic deformation while the accused process effectuates plastic deformation. Consequently, Plaintiff failed to prove by a preponderance of the evidence that the accused process literally infringes the '101 patent.

22. Neither has Plaintiff proven by a preponderance of the evidence that the accused process infringes the '101 patent under the doctrine of equivalents. The '101 patent effectuates the temporary elongation and thinning of metal strands by combining tensions from the pay-off reel, slitter, and recoiler with the tension created in the repeated reverse bending below the yield strength. Conversely, the accused process effectuates thinning and elongation through the application of sheer tension above the yield strength in the pull of the recoiler to achieve permanent elongation. The single up and down reverse bending in the accused process is insufficient to add any significant amount of tension, unlike the '101 patent where repeated reverse bending is necessary to effectuate the elongation. The accused process does not perform in substantially the same way to achieve the same result. Therefore, Defendants did not induce infringement. of the '101 patent.

## II. INVALIDITY

Although Defendants waived their counterclaim of invalidity in the wake of a finding that Defendants did not induce infringement, for purposes of appeal the Court makes the following findings of fact and conclusions of law.

■■■ 23. A presumption of validity arises from the issuance of a patent. *Continental Oil,* 634 F.2d at 195. The validity of a claim depends upon the claim having a clear and definite meaning when construed in the

light of the complete patent document. *Standard Oil,* 774 F.2d at 448. The defendants bear the burden to prove invalidity by clear and convincing evidence. *Buehler,* 836 F.Supp. at 1324.

24. Defendants assert the defenses of public use or sale, obviousness, and best mode, urging the Court to find the '101 patent invalid.

### A. Public Use or Sale

■■■ 25. Prior public use or sale of a process may invalidate a patent for the process. *See Mosler Safe v. Mosler, Bahmann & Co.,* 127 U.S. 354, 8 S.Ct. 1148, 32 L.Ed. 182 (1888); 35 U.S.C. § 102(b) (A person is entitled to a patent unless the invention was in public use or on sale in this country more than one year prior to the date of the application for the patent.).

■■■ 26. The evidence presented at trial establishes that a slitting line with a Strand Tensioner was offered for sale by Plaintiff to the House of Metals as early as June 1979. *See* DX 21. Plaintiff does not deny that the process installed pursuant to the House of Metals sale encompassed the process described in the '101 patent. However, Plaintiff asserts the equipment was installed strictly for testing, experimental purposes, not for commercial sale. Plaintiff's only evidence to support this assertion is the testimony of Mr. Fornataro, president of Plaintiff, that the Strand Tensioner was at the House of Metals for testing purposes and that the House of Metals had been informed of the experimental nature of the equipment.

27. The Court is persuaded that the process sold to and used at the House of Metals equates with a commercial sale. Plaintiff's prior experimentation documented to have occurred at Samuel, Son was expressly denoted as experimental and specifically included test result reports (*see* DX 38). Conversely, none of the documentation presented as evidence to the Court indicates any communication to the House of Metals that the Strand Tensioner was being tested in their installation or that any test results were to be reported, in the pertinent time period.[1]

---

**1.** Dated March 1981, a trip report on "Strand    Tensioner Testing" indicates a representative of

Also, the price for which Plaintiff sold the experimental Strand Tensioner equipment to Samuel, Son (*see* DX 43) was significantly less than the price received by Plaintiff for the sale to the House of Metals (*see* DX 14e). Further, in the proposal process with the House of Metals, Plaintiff stated in written correspondence that it had satisfactorily tested the Strand Tensioner such that Plaintiff's belief in the design criteria was reaffirmed.

28. Contrary to Plaintiff's assertion, the evidence clearly supports the Court's determination that the Strand Tensioner offered for sale to and used by the House of Metals falls within the ambit of § 102(b). Accordingly, the Court finds the '101 patent is invalid.

## B. Obviousness

29. The defense of obviousness, if upheld, renders a patent invalid. *See* 35 U.S.C. § 103 ("[I]f the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains, a patent may not be obtained.").

■ 30. The analysis for obviousness requires factual inquiries as to (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art; and secondary considerations of (4) commercial success, long felt but unresolved needs, and failures of others. *Dennison Manufacturing Co. v. Panduit Corp.*, 475 U.S. 809, 810–811, 106 S.Ct. 1578, 1579, 89 L.Ed.2d 817 (1986) (*citing Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966)).

Plaintiff observed the processing of two coils of aluminum. DX 24. Due to the high quality of the coils prior to slitting, the testing was found to be inconclusive. However, in correspondence from Plaintiff to a West German company, Plaintiff stated that on February 10, 1981, it "established that the concept for the method of coiling into uniformly tight coils of multiple strands was effective." DX 23.

■ 31. It is undisputed that the relevant prior art includes a conventional slitting line and a conventional roller leveler, each of which is a component part of the '101 patent.

32. Defendants rely heavily on the Ohio Knife brochure as evidence of the prior art. The Ohio Knife brochure is entitled, "Slitting: A Basic Guide for the New Operator". DX 119. The brochure discusses the set-up and usage of steel slitting machinery in which Ohio Knives are used. Also discussed in great detail is the care and maintenance recommended for the knives to increase the life span.

33. Defendants assert the illustration in the brochure of Silicon slit strips going through leveler rolls before being recoiled establishes prior art the same as the '101 patent. The caption of the illustration notes the purpose of the leveler is to reduce the grain size of the material which was raised due to distortion created by the original coiling, uncoiling and slitting. DX 119, at 13.[2]

34. Plaintiff offers no response to Defendants' evidence of the Ohio Knife Brochure other than its argument that it should have been permitted to present the testimony of its surprise rebuttal witness to show the brochure is not properly within the scope of the prior art to be considered.

■ 35. Finally, the Strand Tensioner offered for sale to the House of Metals constitutes prior art. A process in public use or on sale within the scope of 35 U.S.C. § 102(b), "is prior art under section 103." *In re Kaslow*, 707 F.2d 1366, 1374 (Fed.Cir. 1983).

36. Based on Plaintiff's acknowledgment that the Strand Tensioner installed at the House of Metals emulates the '101 patent, the Court finds no differences between the prior art and the '101 patent.

2. Defendants also direct the Court's attention to a Herr–Voss technical paper, acknowledging that it cannot constitute prior art because the date composed falls after the '101 patent. Additionally, private intracompany communications describing experimental test models cannot be labeled "prior art". *Continental Oil*, 634 F.2d at 196. Thus, the Court does not consider the technical paper in its analysis of obviousness.

37. In the absence of any difference between the prior art and the '101 patent, it is clear that the process detailed in the '101 patent would have been obvious to a person of ordinary skill in the art.

38. "The linchpin is not whether the individual components of [the patent] were obvious at the time of the invention, but whether the aggregation produced a new or different result ..." *Id.* at 197. The combination of the component parts obvious in the prior art negates any claim that the '101 patent comprises a new invention. The '101 patent is invalid.

## C. Best Mode

■ 39. Whether or not "[t]he specification [sets] forth the best mode contemplated by the inventor of carrying out his invention" is a pivotal issue in determining patent invalidity. 35 U.S.C. § 112. The analysis focuses on what is *contemplated by the inventor* at the time of filing the application. *Glaxo Inc. v. Novopharm Ltd.,* 52 F.3d 1043, 1050–51 (Fed.Cir.1995).

■ 40. The specificity of the disclosure in the patent sufficient to satisfy the statutory requirement is a question of fact which must be determined based on the inventor's knowledge of facts at the time of filing. *Spectra–Physics, Inc. v. Coherent, Inc.,* 827 F.2d 1524, 1535–36 (Fed.Cir.1987).

41. "In order to find that the best mode requirement is not satisfied, it must be shown that the applicant knew of and concealed a better mode than he disclosed." *Engel Industries, Inc. v. Lockformer Co.,* 946 F.2d 1528, 1532 (Fed.Cir.1991) (citation omitted).

■ 42. Defendants counterclaim that the '101 patent is invalid due to the failure of Mr. Fornataro to disclose the best mode of carrying out his invention. Specifically, Defendants claim the '101 patent failed to disclose two types of necessary adjustments: (1) independent adjustments and (2) entry and exit roller height adjustments.

43. Plaintiff responds that the stated adjustments were old and well known in the art, thus, there was no requirement that they be disclosed in the '101 patent. Further, Mr. Fornataro testified that he did not know at the time of filing the patent application that the best mode for his invention embodied the subject adjustments.

44. To establish that the '101 patent does not disclose the better mode, Defendants proffer a test report prepared by Mr. Fornataro in 1977. The test report describes the results and conclusions from testing the prototype installed at Samuel, Son. It was reported that "[t]he exit opening of the tensioner and the entry opening must be readily adjustable." PX 41, at 3. Additionally, the electrical equipment list proposed for the sale of the Strand Tensioner to the House of Metals includes numerous and costly items specifically utilized to implement the subject adjustments. PX 35.

45. Based on the evidence admitted at trial, the Court finds the independent adjustments and the entry and exit roller height adjustments were necessary to carry out the invention of selectively working the thicker strands more than the thinner so as to reduce and elongate for tightly wound coils.

46. The '101 patent fails to disclose the necessary adjustments, therefore, the Court finds the best mode was concealed. Consequently, the Court must find the '101 patent is invalid.

## III. EXCEPTIONAL CASE

47. In an exceptional case, a district court may award reasonable attorney fees to the prevailing party. 35 U.S.C. § 285. The grounds for finding a case exceptional include: "a patent owner's inequitable conduct, vexatious or unjustified litigation, misconduct during litigation, or the filing and prosecution of a groundless suit." *Buehler,* 836 F.Supp. at 1323. Each party asserts this is an exceptional case, yet each denies it is an exceptional case based on their own conduct.

48. Finding no infringement, the Court necessarily finds Defendants did not willfully induce infringement. However, even had the Court determined Defendants induced infringement, a review of the evidence and totality of the circumstances does not support a finding of willfulness.

44

49. "A finding of willfulness requires that the fact-finder find, by clear and convincing evidence, that the infringer acted in disregard of the infringed patent with no reasonable basis to believe it had a right to do the acts in question." *Transmatic, Inc. v. Gulton Industries, Inc.*, 53 F.3d 1270, 1279 (Fed.Cir.1995). The evidence shows Defendants properly obtained an opinion of a patent attorney regarding the potential infringement of the '101 patent. Following additional notice from Plaintiff of possible infringement, Defendants again sought advice from legal counsel. The Court is convinced that Defendants reasonably believed they had a right to proceed with the accused process without infringing on the '101 patent.

50. Defendants presented no argument in support of their claim that this is an exceptional case based on the conduct of Plaintiff.

The evidence presented at trial demonstrated the difficult and close issues warranting the suit filed by Plaintiff. The Court finds the patent owner's conduct was equitable, litigation was not vexatious or unjustified, and there was no misconduct during litigation.

51. The Court finds this is not an exceptional case and declines to award attorney fees to either party.

IV. CONCLUSION

For the reasons given above, Plaintiff takes nothing on its claim that Defendants willfully induced infringement of the U.S. Patent No. 4,614,101. Having waived their counterclaim, Defendants take nothing on the counterclaim of invalidity.

**SO ORDERED.**

# United States Patent [19]

Fornataro

[11] Patent Number: 4,614,101

[45] Date of Patent: Sep. 30, 1986

[54] METHOD OF REWINDING SLIT METAL STRANDS

[75] Inventor: Augustine A. Fornataro, Callery, Pa.

[73] Assignee: Herr-Voss Corporation, Callery, Pa.

[21] Appl No.: 326,187

[22] Filed: Dec. 1, 1981

[51] Int. Cl.⁴ ............ B21D 1/02
[52] U.S. Cl. ................ 72/160; 72/203; 72/377; 242/56.1
[58] Field of Search ............... 72/160, 161, 163, 203, 72/204, 377; 242/56.2, 56.1, 56.7

[56]       References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,216,869 | 10/1940 | Yoder et al. | 72/203 |
| 3,552,175 | 1/1971 | Kinnavy | 72/296 |
| 4,173,313 | 11/1979 | Rogers | 242/56.2 |
| 4,201,352 | 5/1980 | Madachy | 242/56.2 |
| 4,286,451 | 9/1981 | Chang | 72/161 |

| | | | |
|---|---|---|---|
| 4,347,723 | 9/1982 | Bradlee | 72/203 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1415122 | 8/1973 | United Kingdom | |
| 1543284 | 6/1975 | United Kingdom | 72/161 |

Primary Examiner—Daniel C. Crane
Attorney, Agent, or Firm—Buell, Ziesenheim, Beck & Alstadt

[57]          ABSTRACT

Multiple strands of metal slit from strip which varies in thickness from edge to center are separately coiled on the same mandrel into uniformly tight coils by selectively working the strands so as to reduce the thickness and elongate thicker strands more than thinner strands The working is preferably accomplished by imparting reverse bends to the strands while tensioning them in amounts less than the tensile yield strength of the metal

5 Claims, 1 Drawing Figure

4,614,101

# METHOD OF REWINDING SLIT METAL STRANDS

This invention relates to the rewinding of strands of metal slit from a coil. It is more particularly concerned with a process for rewinding into uniformly tight coils strands slit from strip varying in thickness from center to edge.

Narrow metal strip, for example, steel strip, is economically produced by slitting wider strip into multiple strands. This is done by passing the wide strip through a rotary slitter. The multiple strands resulting then must be rewound into coils, and this is conventionally done on a single mandrel, the adjoining coiled strands being spaced from each other. It is generally the case that the wide strip varies somewhat in thickness from edge to center, frequently being thicker at the center than at the edges. Thus, when multiple strands are coiled, the thicker strip builds up into a coil of larger outside diameter than coils of thinner strands, and the thinner strands, being under less tension than the thicker strands, sag between slitter and recoiler while the thicker strands stay taut. Loosely wound coils are frequently not acceptable by the customer because they cannot be properly handled in subsequent processing equipment.

Various expedients have been used for dealing with this problem. The most primitive method requires that an operator be stationed at the recoiler. As slack develops in a strand, he inserts small pieces of cardboard or other material between the approaching slack strand and the rewound coil, so as to increase its outer diameter to that of the tightly wound coils. This procedure is costly and is hazardous to the operator. A second method of recoiling slit strands of varying thickness employs a series of slip cores, one for each strand coil, which are placed on the mandrel and driven by friction in such a way that each core is driven by a relatively constant frictional torque at different speeds, thus permitting tension to be maintained on each slit strand as it is rewound. In this method, each slip core slips relative to the mandrel at a different rate, and to maintain tension on all strands, the recoiler is rotated at a speed faster than the rotational speed of the fastest rotating coil, which corresponds to the thinnest material. This method requires that the cores, usually made from cardboard, micarta, or steel, be accurately made and that they be positioned on the mandrel with great care. The means to provide frictional driving torque are usually a metal disc keyed to the mandrel against which a compressive force is applied by a pneumatically or hydraulically actuated cylinder. Means to keep the slit strands separated must also be provided. To avoid the need for such means, many applications of this method have utilized two or more rewind mandrels.

A third method to rewind slit strands of varying thickness also employs sleeves or hollow cores on which each slit strand is rewound; but, in contrast to the previous method, each sleeve is positively driven by the mandrel at the same rotational speed. The sleeves are not inherent to the process but are used to permit rewinding on very small mandrels and/or to facilitate subsequent handling of the slit coil. This method requires an exit tensioning device against which the driven sleeves can pull and a strip accumulation pit. The need for the pit arises from the increasing differences in the diameters of coils of thicker slit strands with respect

to those of the thinner slit strands, as all strands are rewound at constant rotational speed in this method. Such pits are often over 100 feet in depth. They are expensive to build and to maintain. Further, elaborate provisions must be made to separate the strands as they emerge from the pit and to provide each strand with some initial tension before engaging the exit tensioning device.

The above mentioned methods in use prior to my invention to be described are makeshifts; and do not attack the basic problem, which is the difference in thickness between strands slit from the same coil.

It is an object of my invention to provide a process for rewinding slit metal strands of different thicknesses into uniformly tight coils that require no manual intervention. It is another object to provide such a process in which all the slit strands are rewound at the same rotational speed. It is another object to provide a process which prevents overlapping of adjoining strands. Other objects of my invention will appear in the course of the description thereof which follows.

In my process I slit metal strip from a coil which may vary in thickness across its width. The multiple strands so slit are recoiled on the same mandrel at the same rotational speed, spaced from each other. Between the slitting and the recoiling step I selectively work the strands so as to elongate and simultaneously thin out the thicker strands more than the thinner strands. Thus the strands tend to be recoiled into coils of uniform tightness. I preferably work the strands selectively by subjecting them to repeated reverse bending under tension less than the tensile yield strength of the metal.

The repeated bending reversals produce another desirable result, namely, additional back tension on all strands, with tension modulation of individual strands.

A schematic arrangement of apparatus adapted to practice an embodiment of my process presently preferred by me is illustrated in the attached FIGURE, to which reference is now made.

Strip 10 from a coil 11 mounted on a pay-off reel 12 is introduced into a conventional slitter 13 which slits it into multiple strands. Those strands are passed through a strand tensioning apparatus 14, comprising a plurality of parallel upper rolls 15, offset respectively in the direction of strand travel from a plurality of parallel lower rolls 16 but overlapping them in the path of strand travel so as to bend the strand downwardly and upwardly in reverse fashion as the strands pass through the rolls. Rolls 15 and 16 may be provided with back-up rolls to prevent roll bending. The multiple strands leaving tensioning device 14 are recoiled side-by-side on the same mandrel 18, into individual coils 17.

Strand separators 19 and 20 are located just ahead of the strand tensioning device and at the coiling reel respectively.

Tension in the strands between slitter 13 and recoiler mandrel 18 is a function of the current supply to the drive motors of the pay-off reel, slitter, and recoiler, the work of the slitting process, and the work associated with the repeated bending strain reversals.

While tension alone below the tensile yield strength of the metal will not elongate and thin the strands, tension in combination with repeated bending reversals of the strands can elongate them and reduce their thickness. All the strands pass between the same bending rolls, but the bending strain reversals produce a greater tension increase in the thicker strands than on the thinner strands. Furthermore, any increase in the diameter

4,614,101

of the coils of thicker material will tend to impose additional tension on the thicker strands. The net effect is to elongate and thin the thicker strands relative to the thin, which is an object of this invention. It is desirable in dealing with the metal strip to work it with rolls of small diameter, in the neighborhood of 1¼ inches or so

The necessary strand elongation and thinning during coil build-up are directly proportional to the thickness of the individual strands, as may be shown.

Let T = minimum strand thickness

Let T + t = maximum strand thickness

Let D = diameter of recoiler mandrel

Let N = number of turns of strands on mandrel

After N revolutions of the mandrel, the speed of the thickest material will be proportional to

$$[D + 2N(T + t)] \tag{1}$$

and the peripheral speed of the thinnest strand will be proportional to

$$[D + 2NT] \tag{2}$$

The ratio of these speeds is

$$\frac{D + 2N(T - t)}{D + 2NT} = 1 + \frac{2Nt}{D + 2NT}$$

When N is small, 2NT is small relative to D and the speed ratio differs from unity by only (2Nt)/D.

It is evident that by elongating the thicker strands by a slight amount, (2Nt)/D, the ratio of peripheral speeds of the coils of strands can be maintained very close to unity throughout the entire coil build-up. The elongation required will be small, because t/D is always very small, approaching 0 as t, the difference in thickness between the thickest strand thinnest strand, diminishes.

It is well known that when metal strip is subject to extension or elongation its thickness will be reduced correspondingly by 70% to 80% of the extension strain.

Thus, if the thickest strand is elongated in the amount indicated by equation (3) above as the strand is rewound throughout the coil build-up, the strand will be continuously thinned, and the required magnitude of elongation will remain approximately (2Nt)/D. In fact, we may consider that as the coil builds up we have essentially an increasing net effective diameter so that the required elongation decreases.

In the foregoing specification, certain preferred embodiments and practices of this invention have been set forth; however, it will be understood that this invention may be otherwise embodied within the scope of the following claims.

I claim:

1. The method of coiling into uniformly tight coils multiple metal strands slit from strip varying in thickness from edge to center comprising working the multiple strands selectively by reverse bending between the same rolls, so as to reduce and elongate the thicker strands more than the thinner strands and then coiling the strands in multiple at the same rotational speed.

2. The method of claim 1 in which the thicker strands are worked to substantially the same thickness as the thinner strands.

3. The method of claim 1 in which the selective working comprises subjecting the strands in multiple to reverse bending while applying tension thereto less than the tensile yield strength of the metal.

4. The method of claim 3 in which the reverse bending is imparted to the strands by passing them in multiple between overlapping upper and lower rolls offset in the direction of strip travel.

5. The method of claim 3 in which the tension is adjusted so that the elongation of the thickest strand is substantially equal to (2Nt)/D where N is the number of turns of strand in a coil, t is the difference in thickness between thickest and thinnest strands and D is the inside diameter of a coil.

* * * * *

PAB/AGRH/ddd

In the United States Patent
and Trademark Office

Group

Examiner

In re application of Augustine A. Fornataro

Serial No. 326,187

Filed December 1, 1981

Method of Rewinding Slit Metal Strands

*PRIOR ART STATEMENT*
*UNDER 37 C.F.R. § 1.97*

Pittsburgh, Pennsylvania 15222

· March 16, 1982

Hon. Commissioner of Patents and Trademarks
Washington, D.C. 20231
Sir:

I

The applicant in compliance with the requirements of 37 C.F.R. § 1.97 brings to the attention of the Examiner the following prior art known to him as of this date:

U.S. Patent 3,552,175 M.G. Kinnavy

II

The subject application concerns a method of coiling into uniformly tight coils multiple metal strands slit from strip varying in thickness somewhat from edge to center. Thus the thickness of the individual strands varies. The method in brief comprises working the thicker strands to substantially the same thinness as the thinner strands so that the coils of all slit strands will be uniformly tight. The strands of slit strip which were originally thicker will be elongated so that the coils thereof will be of correspondingly larger diameter than the coils of the thinner strip.

The method of selectively working the strands comprises subjecting all strands to reverse bending while applying tension thereto less than the tensile yield strength of the strands. The thicker strands are thereby elongated more than the thinner strands.

The Kinnavy patent discloses a method of permanently elongating strip by applying tension thereto and reverse bending it so as to exceed the yield strength of the metal. It does not deal with the tensioning of slit strip in multiple.

III

It is submitted that the subject application is patentable over the above-mentioned reference.

Respectfully submitted,
BUELL, BLENKO, ZIESEN-
HEIM & BECK
By _Paul A. Beck_
    Paul A. Beck,
Registration No. 22,289
Attorneys for Applicant

(412) 471–1590
    Ext. 32